UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HARRY ARMITAGE and THOMAS
ARMITAGE,

                Plaintiffs,

Vs                          Case No.: 6:05-CV-890-ORL-19KRS
                            CONSOLDIATED W/ 6:05-CV-891-ORL-19DAB.

DOLPHIN PLUMBING & MECHANICAL,
LLC. and RALPH PARROTT,

                Defendants.
_____/

## PLAINTIFFS' CLOSING ARGUMENT

To establish a claim under the Fair Labor Standards Act, a plaintiff must show the following:

(1) Employment – the existence of an employment relationship with the defendant.[1]

(2) Coverage – establish that the employee is covered under the Act through individual (traditional) coverage (i.e. his job requires his participation in interstate commerce) or through "enterprise coverage" in which all employees of the business are covered under the Act.

(3) Knowledge – the employer's constructive or actual knowledge of overtime worked or wage payments in violation of the Act.[2]

(4) Amount owed – the performance of some work for which the employee was not properly compensated under the Act and the amount of such liability at least by a just and reasonable inference.[3]

---

[1] Davis v. Food Lion, Inc., 792 F.2d 1274, 1276

[2] Reich v. ConAgra, Inc., 987 F.2d 1357, 1360 (8th Cir.1993)

[3] Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)

The employment relationship between Dolphin Plumbing and Thomas Armitage was established by the testimony of the parties. Whether Harry Armitage was an employee covered by the Act or an independent contractor is in dispute.

The testimony of Ralph Parrott established that Dolphin Plumbing had gross receipts in excess of $500,000 and the testimony of Thomas Armitage established that the materials plaintiffs handled had been in interstate commerce. Thus, coverage has been established under enterprise coverage. 29 U.S.C. 203(s)(1) (2005).

Without question, Harry Armitage's time Field Time Sheets (Plaintiffs' Ex.3), which Ralph Parrott received, showed him working more than 40 hours. Furthermore, Thomas Armitage testified he had numerous conversations with Richard Parrott about working overtime. Thus, the third element is met.

Plaintiffs detail their damages later in this submission.

## I.   THE RAMIFICATIONS FOR DEFENDANTS RESULTING FROM FAILING TO MAINTAIN TIME AND PAYROLL RECORDS[4]

29 CFR §516.2 (2005) requires employers to maintain time and payroll records. When an employer, as in this case, has failed to keep accurate records of the actual time its employees work each week, approximation may be used. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *McLaughlin v. Stineco, Inc.*, 697 F.Supp. 436, 450 (M.D.Fla.

---

[4] Defendant Ralph Parrott testified that the Field Time Sheets for the Plaintiffs were either loss during Hurricane Charley or may have flown off the back of his truck while driving down I-4. Such testimony is akin to "the dog ate my homework." The Defendants, however, were able to provide self-serving time sheets for Harry Armitage for the period when Harry Armitage was strictly piece rate and other records helpful to their case such Defendants' Exhibits 4, 8, 9, 10 and 16. Miraculously, these records "survived" the ravages of Hurricane Charley and the I-4 fiasco. Given Ralph Parrott's lack of candor in other parts of his testimony, including the introduction of an apparent fraudulent document (Defendants' Ex. 9), Parrots' explanation for the lack of records is dubious at best.

1988). The Plaintiff may satisfy his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *Mt.Clemens,* 328 U.S. at 687; *Stineco,* 697 F.Supp at 450. **Once the inference is established the burden then _shifts_ to the employer to come forward with evidence of the _precise_ amount of work performed or with evidence to _negate_ the reasonableness of the inference to be drawn from the employee's evidence.** *Mt. Clemens,* 328 U.S. at 687; *Stineco* 697 F.Supp. at 450.

The testimonies of Thomas Armitage and Harry Armitage, bolstered by the records produced by Harry Armitage and the testimony of John Hill, show that Plaintiffs have produced sufficient evidence to create a just and reasonable inference as to the hours worked, specifically an average of 48 hours per week. At no time did Defendants come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference drawn from the Plaintiffs' evidence. In fact, Plaintiffs' estimates of 48 hours of work per week were unrebutted by the Defendants.

**A. Harry Armitage Was an Employee and Not an Independent Contractor**

The FLSA does not specifically define the limits of the employee-employer relationship, and instead only offers a vague definition of the term "employee." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Santelices v. Cable Wiring,* 147 F.Supp.2d 1313, 1318 (S.D.Fla. 2001). Under the Act, an "employee" is one who is "employed," and "employ" is defined as "to suffer or permit to work." *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir.1976) (*citing* 29

3

--

U.S.C. §§ 203(e), (g)). Because the FLSA is a remedial statute, courts apply an expansive definition of "employee." *Rutherford Food,* 331 U.S. at 728, 67 S.Ct. 1473; *Usery,* 527 F.2d at 1311; *see also Harrell v. Diamond A Entm't, Inc.,* 992 F.Supp. 1343, 1348 (M.D.Fla.1997) (noting that "employment is defined with striking breadth," and that the "suffer or permit to work standard ... has been called the broadest definition [of employee] that has ever been included in one act.").

The label the parties put on the relationship is not determinative, nor is it relevant whether the parties intended to create an employment relationship. *Rutherford Food,* 331 U.S. at 729, 67 S.Ct. 1473; *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981); *Santelices,* 147 F.Supp.2d at 1319. The fact that a contract identifies the Harry Armitage as an independent contractor, and that his taxes were handled as if he were independent contractors has little relevance.[5] *Baker v. Barnard Constr. Co., Inc.*, 860 F.Supp. 766, 772 (D.N.M. 1994)("An employee is not permitted to waive employee status."). This is particularly true in cases where the employee did not have the ability to negotiate whether he would be treated as an independent contractor. *Id.*. As noted in *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 302-03 (5th Cir. 1987):

> It is clear beyond peradventure that the parties' attempt to fasten a name of 'independent contractor' or 'employment' to their relationship by their own agreement- or, worse, where one party imposes a name on the other-will avail them little in ascertaining what the relationship is for purposes of the F.L.S.A. or similar legislation. . . An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of the duties under the F.L.S.A., by granting him

---

[5] One court has differentiated between employees and independent contractors as follows:
"Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how it will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits.

*N.L.R.B v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 919 (11th Cir.1983)

4

some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operates.

To determine employee status under the FLSA, courts focus on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he renders his services. "In other words, [the court's] task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir.1998); This "economic reality" or "economic dependence" inquiry involves a number of factors, including (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Herman,* 161 F.3d at 303; *see also Tehco,* 642 F.2d at 143; *Usery,* 527 F.2d at 1312, *Stineco*, 697 F.Supp. at 448. Courts have added a sixth consideration: the degree to which the alleged employee's tasks are integral to the employer's business. *Harrell v. Diamond Entertainment, Inc.*, 992 F.Supp. 1343, 1348 (M.D.Fla. 1997) This factor looks at whether the work performed by the employee is the same type of work the employer performs for its customers.

No one isolated factor is determinative; instead, courts look to the "circumstances of the whole activity." *Rutherford Food,* 331 U.S. at 730, 67 S.Ct. 1473; *Herman,* 161 F.3d at 303. These factors are used to gauge the degree to which the alleged employee is dependent upon the business with which he or she is connected, because dependence is the primary indicator of employee status. *Usery,* 527 F.2d at 1311. Ultimately, the final and

5

--

determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside of its ambit. *Id.* at 1311-12. This "dependency" question may be broken down into two factors: "(1) how specialized the nature of the work is, and (2) whether the individual is in business for himself." *Halferty v. Pulse Drug Co., Inc.,* 821 F.2d 261, 265 n. 3 (5th Cir.1987) (internal citation and quotation omitted); *see also Mednick v. Albert Enters., Inc.,* 508 F.2d 297, 302 (5th Cir.1975) ("The concept has also been put in terms of whether the individual is in business for himself.").

The following facts all indicate that Harry Armitage was not an independent contractor: (1) the working relationship lasted more than three years; (2) Harry Armitage worked exclusively for Dolphin Plumbing during his employment; (3) for most of his employment, Harry Armitage was paid by the hour; (4) Harry Armitage did not carry liability or workers' comp insurance;.[6] (5) Harry Armitage had an occupational license for 2002 only and Defendants did not require proof thereafter; (6) Harry Armitage took limited tools to the job and larger tools were provided by the Defendant; (7) Harry Armitage was economically dependent on his employment with Dolphin Plumbing; (8) Harry Armitage made no investment of his own money to work as a plumber for Dolphin Plumbing; (9) Harry Armitage performed work (plumbing) which was integral to the business of Dolphin Plumbing; (10) Harry Armitage did not control the order and time to complete projects;

---

[6] Defendants' Ex. 9 purports to be a certificate of insurance from Harry Armitage. As was demonstrated by the testimony of Terry James, the document was a fraud. Given the fact that Ralph Parrott's wife owned an insurance agency during Plaintiffs' employment and, unlike Harry Armitage, would have had access to the certificate form used, logic dictates that Ralph Parrott or his wife manufactured the certificate and knowingly tried to pass it off to the Court as the real thing.

6

--

(11) Harry Armitage received employee-related benefits like paid vacations, paid holidays, use of a company truck and gas card; mileage, as well as paid lodging on out-of-town jobs.

### B. Harry Armitage Worked an Average of 48 Hours Per Week

When Harry Armitage began working for Dolphin Plumbing, he was paid strictly on a piece rate basis. Dolphin Plumbing did not require him to track his hours at this point. As shown from Plaintiffs' Ex. 4 and 17, beginning with the paycheck dated November 7, 2002, Harry Armitage began receiving an hourly wage for non-piece rate work in addition to his piece rate work. At this point, Harry Armitage began keeping track of his non-piece rate work hours. Beginning with the check dated April 24, 2003, Harry Armitage was paid strictly by the hour and he began keeping a daily account of his hours worked. Harry Armitage produced copies of many of the time sheets which showed the hours he worked. (Plaintiff's Ex. 3). Harrry Armitage also has his payroll stubs (Plaintiff's Ex. 4) as well as a record of every check he received (Plaintiff's Ex. 17). **The payroll records and pay stubs comport to the hours reported on the time sheets he has in his possession**. From the payroll records, pay stubs and time sheets, Harry Armitage was able to determine the exact hours he worked for most of the weeks he was employed. For example, if the pay records showed he received $600.00 for the week in which he was receiving $15.00 per hour, but no time sheet exists, then he would know that he worked 40 hours that week ($600 / $15 = 40 hours). Easier are the weeks where Harry Armitage has the actual time sheet. Many of these time sheets show more than 40 hours worked.

From the records where Harry Armitage was able to determine the exact number of hours worked, he derived an average of 48 hours per week. This average was representative

of the entire time he worked, including the months when he worked piece-rate. The documents and testimony of Harry Armitage create and just and reasonable inference of the number of hours claimed. Based upon a 48 hour average, Harry Armitage was able to calculate his damages.

### C. Harry Armitage's Damages

**Time Period – June 26, 2002 to April 17, 2003 (Strictly Piece Work)**

Estimated number of hours worked each week– 48

| Check Date | Amount Paid | Half – Time Rate | Overtime Owed[7] |
| --- | --- | --- | --- |
| July 3, 2002 | $680.00 | $7.08 | $56.64 |
| July 18, 2002 | $1,152.50 | $12.00 | $96.00 |
| August 8, 2002 | $1,470.00 | $15.31 | $122.48 |
| August 22, 2002 | $1,540.00 | $16.04 | $128.32 |
| September 5, 2002 | $1,160.00 | $12.08 | $96.64 |
| September 12, 2002 | $780.00 | $8.13 | $65.04 |
| September 19, 2002 | $600.00 | $6.25 | $50.00 |
| September 26, 2002 | $1,140.00 | $11.88 | $95.04 |
| October 3, 2002 | $1,320.00 | $13.75 | $110.00 |
| October 10, 2002 | $680.00 | $7.08 | $56.64 |
| October 17, 2002 | $795.00 | $8.28 | $66.24 |
| October 24, 2002 | $840.00 | $8.75 | $70.00 |
| October 31, 2002 | $600.00 | $6.25 | $50.00 |
| November 14, 2002 | $660.00 | $6.88 | $55.04 |
| November 21, 2002 | $705.00 | $7.34 | $58.72 |
| November 26, 2002 | $630.00 | $6.57 | $52.56 |
| December 6, 2002 | $1,200.00 | $12.50 | $100.00 |
| December 12, 2002 | $1,132.50 | $11.80 | $94.40 |
| December 18, 2002 | $1,950.00 | $20.31 | $162.48 |
| December 26, 2002 | $735.00 | $7.66 | $61.28 |
| January 2, 2003 | $1,537.50 | $16.02 | $128.16 |
| January 8, 2003 | $720.00 | $7.50 | $60.00 |
| January 16, 2003 | $1,050.00 | $10.94 | $87.52 |
| January 21, 2003 | $1,200.00 | $12.50 | $100.00 |
| January 30, 2003 | $487.50 | $5.08 | $40.64 |
| February 6, 2003 | $622.50 | $6.49 | $51.92 |

---

[7] Overtime is calculated as follows, Amount Paid ÷ Hours Worked (48) x .5 x Overtime Hours Worked. This is the method dictated for pieceworkers by the DOL regulations. *See,* 29 CFR §778.111 (2005).

8

--

| | | | |
|---|---|---|---|
| February 13, 2003 | $615.00 | $6.40 | $51.20 |
| February 20, 2003 | $1,260.00 | $13.13 | $105.04 |
| February 27, 2003 | $727.50 | $7.58 | $60.64 |
| March 6, 2003 | $1,200.00 | $12.50 | $100.00 |
| March 13, 2003 | $1,305.00 | $13.60 | $108.80 |
| March 20, 2003 | $780.00 | $8.13 | $65.04 |
| March 27, 2003 | $825.00 | $8.60 | $68.80 |
| April 2, 2003 | $712.50 | $7.42 | $59.36 |
| April 10, 2003 | $675.00 | $7.03 | $56.24 |
| April 17, 2003 | $1,402.50 | $14.61 | $116.88 |
| **Total** | | | **$2,897.76** |

**Time Period – April 18, 2003 to September 16, 2004 - Hourly $15.00**

| Check Date | Hours Worked | Amount Paid | Overtime Owed |
|---|---|---|---|
| May 1, 2003 | 56 | $840.00 | $120.00 |
| May 8, 2003 | 53 | $795.00 | $97.50 |
| May 15, 2003 | 49.5 | $742.50 | $71.25 |
| May 22, 2003 | 49.5 | $742.50 | $71.25 |
| May 29, 2003 | 43 | $645.00 | $22.50 |
| June 5, 2003 | 45 | $675.00 | $37.50 |
| **June 12, 2003** | **49.67** | **$820.00[8]** | **$72.53** |
| June 19, 2003 | 49.5 | $742.50 | $71.25 |
| July 2, 2003 | 57.50 | $862.50 | $131.25 |
| July 10, 2003 | 44.50 | $667.50 | $33.75 |
| July 17, 2003 | 48 | $720.00 | $60.00 |
| July 24, 2003 | 56 | $840.00 | $120.00 |
| July 30, 2003 | 55 | $825.00 | $112.50 |
| August 7, 2003 | 54.50 | $817.50 | $108.75 |
| August 14, 2003 | 52.50 | $787.50 | $93.75 |
| August 21, 2003 | 58.50 | $877.50 | $138.75 |
| August 28, 2003 | 58.50 | $877.50 | $138.75 |

---

[8] Plaintiff testified that all hours recorded each day were either whole numbers such as 8 or fractional numbers ending in .5 such as 8.5. The highlighted entries indicate the absence of a time sheet for that week. In the highlighted entries, when the hourly rate ($15 or $16) is divided into the pay received, the quotient is something other than a whole number or a fractional number ending in .5. In such cases, Plaintiff established that the paycheck included an expense reimbursement in addition to the hours worked at $15.00 or $16.00 an hour, thus causing the odd fractional number such as 42.3666. Because Defendants cannot provide payroll records specifically stating the amount of the expense reimbursements, Plaintiff must estimate the expense so as not to include it in determining the regular rate of pay for that week. Based upon what records do exist demonstrating the amounts of these reimbursements, plaintiff estimates an average cost reimbursement of $75.00. Thus, in those weeks where an expense reimbursement appears to be present, plaintiff has subtracted $75.00 from the amount of compensation paid and used the remainder as the basis for calculating the overtime owed for that week. For example, if the total amount paid during the time Plaintiff was paid $15 per hour was $820.00, Plaintiff has reduced that amount by $75.00 to $745.00. That remainder is divided by the applicable rate of pay ($15) to achieve the number of hours worked hat week (49.67). To determine the overtime pay due for that week, Plaintiff multiplied the overtime hours (9.67) by the half-rate of $7.50 resulting in $72.53.

9

--

| Date | | | |
|---|---|---|---|
| September 1, 2003 | 55 | $825.00 | $112.50 |
| September 11, 2003 | 52 | $780.00 | $90.00 |
| September 18, 2003 | 57.50 | $862.50 | $131.25 |
| **September 25, 2003** | **46.17** | **$767.50** | **$46.28** |
| October 2, 2003 | 58 | $870.00 | $135.00 |
| October 9, 2003 | 55 | $825.00 | $112.50 |
| October 16, 2003 | 59.50 | $892.50 | $149.25 |
| October 23, 2003 | 53 | $795.00 | $97.50 |
| October 30, 2003 | 53.50 | $802.50 | $101.25 |
| November 6, 2003 | 56.50 | $847.50 | $123.75 |
| November 13, 2003 | 56.50 | $847.50 | $123.75 |
| **November 20, 2003** | **60.23** | **$978.45** | **$151.73** |
| November 25, 2003 | 63.50 | $952.50 | $176.25 |
| December 4, 2003 | 48.50 | $727.50 | $63.75 |
| December 18, 2003 | 54.50 | $817.50 | $108.75 |
| December 23, 2003 | 54 | $810.00 | $105.00 |
| **January 15, 2004** | **53.83** | **$882.50** | **$103.73** |
| **January 22, 2004** | **55.17** | **$902.50** | **$113.78** |
| **January 29, 2004** | **60.07** | **$976.00** | **$150.53** |
| February 5, 2004 | 47 | $705.00 | $52.50 |
| February 12, 2004 | 48 | $720.00 | $60.00 |
| February 26, 2004 | 59.50 | $892.50 | $146.25 |
| March 4, 2004 | 58 | $870.00 | $135.00 |
| March 11, 2004 | 60 | $900.00 | $150.00 |
| March 18, 2004 | 59.50 | $892.50 | $146.25 |
| March 25, 2004 | 52.50 | $787.50 | $93.75 |
| April 1, 2004 | 45 | $675.00 | $37.50 |
| April 8, 2004 | 44.50 | $667.50 | $33.75 |
| April 15, 2004 | 53 | $795.00 | $101.25 |
| **April 22, 2004** | **49.17** | **$812.50** | **$68.78** |
| April 28, 2004 | 51 | $765.00 | $82.50 |
| May 6, 2004 | 52 | $780.00 | $90.00 |
| May 20, 2004 | 52 | $780.00 | $90.00 |
| May 26, 2004 | 50 | $750.00 | $75.00 |
| June 3, 2004 | 48 | $720.00 | $60.00 |
| June 16, 2004 | 44 | $660.00 | $30.00 |
| June 24, 2004 | 43 | $645.00 | $22.50 |
| July 8, 2004 | 47 | $705.00 | $52.50 |
| July 15, 2004 | 48 | $720.00 | $60.00 |
| July 22, 2004 | 54 | $810.00 | $105.00 |
| July 29, 2004 | 46 | $690.00 | $45.00 |
| August 12, 2004 | 46 | $690.00 | $45.00 |
| **August 26, 2004** | **48** | **$754.50** | **$56.63** |
| September 2, 2004 | 46 | $690.00 | $45.00 |
| **Total** | | | **$5,581.99** |

**Time Period – September 17, 2004 to March 24, 2005 - Hourly $16.00**

| Check Date | Hours Worked | Amount Paid | Overtime Owed |
|---|---|---|---|
| **September 30, 2004** | **51.18** | **$893.90** | **$89.44** |
| October 7, 2004 | 55.50 | $888.00 | $124.00 |
| October 14, 2004 | 54 | $864.00 | $112.00 |
| October 21, 2004 | 44 | $704.00 | $32.00 |
| November 10, 2004 | 47.50 | $760.00 | $60.00 |
| November 23, 2004 | 41 | $656.00 | $8.00 |
| December 9, 2004 | 46 | $736.00 | $48.00 |
| January 27, 2005 | 48.50 | $776.00 | $68.00 |
| February 2, 2005 | 49.50 | $792.00 | $76.00 |
| February 17, 2005 | 49.50 | $792.00 | $76.00 |
| February 24, 2005 | 42.50 | $680.00 | $20.00 |
| March 3, 2005 | 42 | $672.00 | $16.00 |
| **Total** | | | **$729.44** |

Total OT (all time periods)                    **$9,209.19**

### III.   THOMAS ARMITAGE

#### A.  Thomas Armitage Worked More Than 40 Hours Per Week

In this case, Thomas Armitage estimated that he averaged 48 hours of work per week. He explained that his working hours were similar to those of his brother. As previously shown, Harry Armitage produced many, but not all, of his time records and payroll information. From the significant but incomplete records he was able to estimate an average of 48 hours of work per week. The fact that Plaintiffs worked overtime was supported by the testimony of John Hill. Accordingly, Thomas Armitage has provided sufficient evidence to show the amount and extent of his work as a matter of just and reasonable inference.

Not only did Defendants fail to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference drawn

11

from the evidence produced by Thomas Armitage, Defendant failed to produce one witness with personal knowledge of the amount of hours Thomas Armitage worked. Defendants surely could have called one current or former employee who actually worked with Thomas Armitage and who could refuted the hours claimed. The inference which may be drawn from failing to produce such a witness is that no such witness would have provided such testimony under oath.

### B.     Thomas Armitage Was Not Exempt

The employer bears the burden of proving the executive exemption.[9] *Avery v. City of Talladega*, 24 F.3d 1337, 1340 (11th Cir.1994). The exemption must be proved by clear and affirmative evidence. *Klinedinst v. Swift Investments, Inc.*, 260 F3d 1251, 1254 (11th Cir.2001). This Court must construe overtime exemptions narrowly, against the employer. *Id.*

The definition of the executive exemption is found at 29 CFR 541.1 (2004):[10]

> The term employee employed in a bona fide executive * * * capacity in section 13(a)(1) of the Act shall mean any employee:
>
> (a) Whose primary duty consists of the management of the enterprise which he is employed or of a customarily recognized department of subdivision thereof; and

---

[9] In their response to Defendants' motion for summary judgment, Plaintiffs argued that Defendants waived the defense of the executive exemption because it was not pleaded as an affirmative defense. *See*: *Brennan v. Corning Glass Works*, 417 U.S. 188, 196-97 (1974); *Mitchell v. Williams*, 420 F2d 67, 68 n.1 (8th Cir.1969); *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21, 27 (5th Cir.1964); *Morrison v. Executive Aircraft Refinishing, Inc.*, 2005 WL 4123463 (S.D.Fla. 2005); *Donovan v. Rosie O'Grady's of Orlando, Inc.*, 1982 WL 2164 (M.D.Fla. 1982). The Court rejected that argument. Plaintiffs renew this argument in closing.

[10] 29 U.S.C. §213(a)(1) expressly authorizes the Secretary of Labor to define and delimit by regulations the scope of exemptions for executive, administrative, professional and outside sales employees. Because the FLSA expressly delegates to the Secretary authority to craft legislative regulations, these regulations are given the force and effect of law, subject to the standard of *Chevron USA v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984). *See also Martin v. Tango's Restaurant,* 969 F.2d 1319, 1325 (1st Cir.1992)(Secretary's regulations with respect to "executive" exemption have "special importance.")

(**b) Who customarily and regularly directs the work of two or more other employees therein**; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) **Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section**: Provided, that this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section. (emphasis added). [11]

### 1.  Management Was Not Thomas Armitage's Primary Duty

Under the old regulations, the DOL has defined Management and Primary Duty as they relate to the executive exemption as follows:

---

[11] The Department of Labor effective August 23, 2004 revised many of the regulations concerning the FLSA, including those addressing the executive exemption. Plaintiff's overtime claim spans both the old and new regulations with the majority of his claim covered by the old regulations. The new regulations (hereinafter "new regulations") do not greatly differ from the old regulations and a separate analysis under each is redundant.

13

--

**Sec. 541.102  Management**.

(a) In the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

(b) For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

**Sec. 541.103  Primary duty**.

A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or

>performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty. In the data processing field an employee who directs the day-to-day activities of a single group of programmers and who performs the more complex or responsible jobs in programming will be considered to have management as his primary duty.

Plaintiff concedes that he performed some of the duties listed as "management." However, many he did not perform, i.e. appraising employee productivity and efficiency; setting and adjusting rates of pay. Furthermore, when examining the "primary duty" factors, they weigh in favor of excluding the exemption. For example, Thomas Armitage testified that his pay was often less than what the piece rate workers paid. On each construction site, the general contractor had representatives supervising the work Thomas Armitage performed as well as weekly inspections by Ralph Parrott; thus, he was not free from supervision It was clear from the testimony that the importance of Thomas Armitage on the work site was not management of the project, but instead, the installation of pipes, sewer lines and toilets. **Furthermore, what is critical in the analysis is that Defendants did not rebut Thomas Armitage's estimate that 80% to 90% of the time he was performing non-management work,** *i.e.* **plumbing**.

Defendants seem to place great stock in the fact Thomas Armitage was qualifying agent for Dolphin Plumbing. The fact that Thomas Armitage was the qualifying agent is meaningless to executive exemption analysis. What matters is what were Thomas Armitage's actual duties on a day-today basis versus what a state statute may require. Thus, being the qualifying contractor does not by definition mean Thomas Armitage was involved in the management of the company or supervision of its employees or the work performed.

Management cannot be seen as Thomas Armitage's primary duty. At best, Thomas Armitage was a working foreman. The DOL regulations define a working foreman as it relates to this case at 29 CFR § 541.115(a) and (b) (2004):

> **Sec. 541.115  Working foremen**.
>
> (a) The primary purpose of the exclusionary language placing a limitation on the amount of nonexempt work is to distinguish between the bona fide executive and the ``working'' foreman or ``working'' supervisor who regularly performs production'' work or other work which is unrelated or only remotely related to his supervisory activities. (The term ``working'' foreman is used in this subpart in the sense indicated in the text and should not be construed to mean only one who performs work similar to that performed by his subordinates.)
>
> (b) One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates. Such employees, sometimes known as strawbosses, or gang or group leaders perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions. Clearly, the work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption does not apply. (``Substantial,'' as used in this section, means more than 20 percent. See discussion of the 20-percent limitation on nonexempt work in Sec.541.112.) A foreman in a dress shop, for example, who operates a sewing machine to produce the product is performing clearly nonexempt work. However, this should not be confused with the operation of a sewing machine by a foreman to instruct his subordinates in the making of a new product, such as a garment, before it goes into production.

The unrebutted testimony from Thomas Armitage shows that he fit more closely into the working foreman than as an exempt executive.

### 2. Defendants Failed to Establish that Thomas Armitage Supervised the Equivalent of Two or More Full-Time Employees Each Week He Worked

To qualify for the executive exemption 29 CFR §541.105 (2004) requires that Thomas Armitage supervise the equivalent of two or more full-time employees for ***each*** week the Defendants claim the exemption. In its Field Operations Handbook, the DOL defines two full-time employees or the equivalent as 80 hours of work by subordinate

16

--

employees. FOH §22c00. Thus, a manager could supervise two employees working 40 hours per week or four employees working 20 hours per week as long as the man hours totaled 80 or more each week. In this case, Defendants failed to present evidence that Thomas Armitage supervised two or more full-time employees or the equivalent for each week they claim the exemption. Accordingly, the Defendants have not met their burden in proving every element of the exemption. *See, Perez v. Radioshack Corp.*, 2005 WL 2897378 *4 (N.D.Ill. 2005)(thorough discussion of the 80 hour bright-line rule and necessity of employers to prove number of hours worked each week to claim exemption).

### C. Thomas Armitage's Damages

Because Thomas Armitage was paid a salary, the proper formula for calculating his weekly overtime is: Total Pay / Total Hours Worked X .5 X Overtime Hours Worked. Thomas Armitage estimated he worked 48 hours per week and this estimate is unrebutted. For the time period June 17, 2002 to May 4, 2003 (46 weeks), Thomas Armitage's weekly salary was $750.00. (Plaintiff's Ex. 2). Thus, $750.00 / 48 X .5 X 8 X 46 weeks = **$2,877.76**. For the period of May 5, 2003 to November 28, 2004 (82 weeks), Thomas Armitage's weekly salary was $900.00. Thus, $900 / 48 X .5 X 8 X 82 weeks = **$6,153.28.** The total overtime owed is **$9,031.04**.

### IV. RALPH PARROTT IS AN EMPLOYER AS DEFINED UNDER THE ACT

In the joint pretrial statement, Defendants stipulated that Ralph Parrott was an employer as defined under the FLSA as to Thomas Armitage. The evidence bears out that he was an employer as to Harry Armitage as well. The question whether a particular defendant is an employer under the FLSA is a question of law. *Patel v. Wargo,* 803 F.2d 632, 634 (11th Cir.1986). The Act itself defines employer as "any person acting directly or

17

--

indirectly in the interest of an employer in relation to an employee and includ[ing] a public agency....*"* 29 U.S.C. § 203(d). "To be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." *Patel,* 803 F.2d at 638.

The evidence in this case is that Ralph Parrott was an officer of the company involved in the day-to-day operation of the business. Harry Armitage faxed weekly time sheets showing the overtime hours worked. Ralph Parrott determined the pay for Harry Armitage. Ralph Parrott hired Harry Armitage. When a corporate officer like Ralph Parrott exercises "pervasive control over the business, financial and employment affairs" of the business, the officer will be judged to be an "employer" as defined under the FLSA. *Stineco, Inc.*, 697 F.Supp at 448.

## V. DEFENDANTS' VIOLATION OF THE ACT WAS WILLFUL AND THE THREE-YEAR STATUTE OF LIMITATIONS IS APPLICABLE

29 U.S.C. §255 provides a two-year statute of limitation for FLSA unless a claim arises from a "willful violation." An employer willfully violates the FLSA where it either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). "Reckless disregard" is defined as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104 (2005); *see also Alvarez v. IBP, Inc.,* 339 F.3d 894, 908-909 (9th Cir.2003)

In this case, Ralph Parrott testified that he was familiar with the overtime requirements of the FLSA. He testified that his company pays overtime when it is worked. Ralph Parrott also testified that his company even now does not keep a record of hours

18

--

worked by piece rate workers. This is true even after he and his company was sued for overtime. Moreover, despite receiving weekly time sheets from Harry Armitage showing he worked more than 40 hours, Dolphin Plumbing still refused to pay overtime. Even Defendants' attempt to label Harry Armitage as an independent contractor when clearly he was not is an obvious effort to facially avoid the requirement of the Act. *Stineco,* 697 F.Supp. at 447, fn.16.

In addition, the Defendants failed to plead the two-year statute of limitations as an affirmative defense or raise it an issue in the Joint Pre-Trial Statement. The failure to plead the two-year statute of limitations as a defense constitutes a waiver of the defense. *Pearce v. Wichita Count,* 590 F.2d 128, 134 (5th Cir.1979); *Mumbower v. Callicott,* 526 F.2d 1183, 1187, fn.5 (8th Cir. 1975); *Hodgson v. Humphries,* 454 F.2d 1279, 1284 (10th Cir.1972). Defendants did not plead the two-year statute of limitations nor is it mentioned in their portion of the pre-trial statement. Accordingly, it has been waived.

## VI.   PLAINTIFFS ARE ENTITLED TO LIQUIDATED DAMAGES

Under the FLSA "[a]ny employer who violates the provisions of section 206 or section 207 of this title ***shall*** be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in additional equal amount as liquidated damages." 29 U.S.C. §216(b) (emphasis added). There is a strong presumption under the FLSA in favor or awarding liquidated damages. *Shea v. Galaxie Lumber & Construction Co, LTD*, 152 F.3d 729, 733 (7th Cir.1998). Doubling the award is the norm, not the exception. Id.

To escape an award of liquidated damages, the defendant must plead and prove that it acted in "good faith" in not paying the overtime wages. 29 U.S.C. §260. The "good

19

--

faith" defense found in 29 U.S.C. §260 is an affirmative defense that must be pleaded by the employer. *Pierce v. Concrete Products & Supply Co.*, 186 So.2d 751, 755 (1966). Affirmative defenses to FLSA claims which are not pleaded are waived. *See, e.g. Brennan v. Corning Glass Works*, 417 U.S. 188, 196-97 (1974); *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21, 27 (5th Cir.1964); *Conklin v. Hofgesang Sand Co., Inc.*, 565 F.2d 405, 407 (6th Cir.1977*); Mitchell v. Williams*, 420 F2d 67, 68 n.1 (8th Cir.1969); *Brennan v. Valley Towing Co.*, 515 F.2d 100, 104 (9th Cir.1975); *Renfro v. City of Emporia*, 741 F.Supp. 887, 888 (D.Kan.1990), aff'd 946 F.2d 1529, 1539 (10th Cir.1991); *Rontondo v. City of Georgetown*, 869 F. Supp. 369, 373 (D.S.C. 1994); *Donovan v. Rosie O'Grady's of Orlando, Inc.*, 1982 WL 2164 (M.D.Fla. 1982); *Wright v. Aargo Security Services, Inc.*, 2001 WL 91705 *2 (S.D.N.Y. 2001); *Topo v. Dhir,* 2004 WL 527051 *2 (S.D.N.Y. 2004). By not pleading this defense under 29 U.S.C. §260, Defendant waived the defense. Accordingly, the Court should award the liquidated damages.

/s/ CHARLES L. SCALISE, ESQ.
CHARLES L. SCALISE, ESQ.
Bar No.: 0007950
PANTAS LAW FIRM, P.A.
250 North Orange Avenue, 11th Floor
Orlando, Florida 32801
Tel.: (407) 425-5775
Fax.: (407) 425-2778
E-Mail: Clerk@PantasLaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I presented the foregoing to the Clerk of the court for filing and uploading to the CM/ECF system which will send a notice of electronic filing to the following: Joseph Shoemaker, Esq., jshoemaker@boginmunns.com, this 21st day of December, 2006.

/s/ CHARLES L. SCALISE, ESQ.
CHARLES L. SCALISE, ESQ.