UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HARRY ARMITAGE and
THOMAS ARMITAGE,

              Plaintiffs,

                                        Case No.  6:05-cv-0890-Orl-19KRS
-vs-                                    Consolidated With
                                    Case No.  6:05-cv-0891-Orl-19DAB

DOLPHIN PLUMBING &
MECHANICAL, LLC. and
RALPH PARROT,

              Defendants.
_____

# ORDER

This case comes before the Court sitting as trier of fact after a two-day trial held on December 15, 2006 and December 18, 2006. (*See* Doc. Nos. 88, 89). These consolidated actions were brought by Plaintiffs Thomas Armitage and Harry Armitage against Defendants Dolphin Plumbing & Mechanical, LLC. and Ralph Parrot for unpaid overtime wages guaranteed by the Fair Labor Standards Act ("FLSA"). After consideration of the evidence presented at trial and the submissions by the parties, and after making determinations on the credibility of the witnesses, the Court enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, as follows.

## I.  Findings Of Fact

Defendant Dolphin Plumbing & Mechanical, LLC. ("Dolphin Plumbing") performs plumbing subcontractor services at apartment, condominium, hotel and timeshare

construction projects throughout Florida. (Parrot Day 1).[1] Defendant Ralph Parrot is the president and the sole shareholder of Dolphin Plumbing. (*Id.*). As president, Parrot prepared Dolphin Plumbing's billing statements, payroll, and estimates for construction projects. (*Id.*). Further, he determined the payment arrangements of Defendants' workers, decisions which he based upon his years of experience in the plumbing industry and upon research of wage laws that he conducted on the internet. (*Id.*). He also appeared at job sites approximately once a week to supervise the work being conducted for each construction project. (Harry Armitage Day 1).

### A.    Thomas Armitage's Role As A "Project Manager"

Plaintiff Thomas Armitage served as a project manager for Dolphin Plumbing, a position which he had held from February 2002 until he left to found his own plumbing company. (Parrot Day 2; Thomas Armitage Day 1). According to Ralph Parrot, Jerry Spratt, another project manager employed by Defendants, and Thomas Armitage, a person who is a project manager "runs job sites." (Pratt; Parrot Day 2; Thomas Armitage Day 2). That is, a project manager supervises the installation of the plumbing on a construction site. (Spratt). Defendants expected their project managers to keep track of the time and rate of production of workers on each job site and report such information to Ralph Parrot. (Parrot Day 1). Thomas Armitage did so. (Thomas Armitage Day 1). In addition, Thomas Armitage insured that the appropriate materials and equipment were on hand at each construction

---

[1] In this Order, the Court abbreviates its citations to the record by first identifying the witness and then, if necessary, the day of testimony, either Day 1 for testimony given on December 14, 2006 or Day 2 for Testimony given on December 15, 2006.

site by ordering them through Elaine Thomas, Defendants' administrative assistant. (Thomas).

Thomas Armitage was the only state-licensed master plumber employed by Defendants, and in addition to his other roles, he was the "qualifier" for the company. (Thomas Armitage Day 1). He testified that he was "doing everything that . . . the qualifier should have been doing," such as "overseeing the workload," "making sure [the plumbing was] installed correctly," and taking remedial action where necessary. (*Id.*). He also directed the work of the day laborers on the job site "most of the time" and received their complaints. (*Id.*).

Further, Thomas Armitage made sure the proper permits were obtained and, at least in some instances, dealt with suppliers' invoices and payments. (Thomas Armitage Day 1). He also would "walk through" the job site with building inspectors. (Thomas Armitage Day 1). While on the job site, Thomas Armitage attended weekly meetings with a project's general contractor, and when required, he prepared and submitted daily and weekly reports on the progress of the plumbing installation. (Hill; Thomas Armitage Day 1).[2] At all relevant times, Thomas Armitage was paid a salary in excess of $455 per week. (Parrot Day 2).

In addition, Thomas Armitage hired and fired the day laborers on the job sites. Although Thomas Armitage continually downplayed the role that he played in this regard,

---

[2] The testimony concerning daily reports is an example of Thomas Armitage giving testimony that is not credible. Counsel for Defendants had previously questioned John Hill, a friendly witness for Plaintiffs, regarding Mr. Hill's interaction with Thomas and Harry Armitage. Mr. Hill indicated that he based his opinion of both Plaintiffs on, *inter alia*, the daily reports that each submitted to his project supervisors. (Hill). Thomas Armitage denied ever having to prepare daily reports before reversing position and agreeing that he did so on "some" projects. (Thomas Armitage Day 1).

it is clear, from both his own testimony and that of others, that day laborers who appeared at a job site seeking employment would contact him *first*. (Thomas Armitage Day 1; Parrot Day 2; Thomas). He would then call Ralph Parrot to finalize the hiring of these individuals, i.e., distribute employment applications and forward such applications to Defendants. (Thomas Armitage Day 1; Parrot Day 2). At times, Defendants were not aware that some day laborers had been hired by Thomas Armitage until he submitted the time sheet for work performed the previous week. (Parrot Day 2). As to this issue, the Court finds the testimony of Ralph Parrot, who indicated that he played more of an administrative role in hiring, and Jerry Spratt, who testified that he hired and fired people in his role as project manager, more credible than that of Thomas Armitage, who expressed inconsistent positions as to his dealings with day laborers.

The greater weight of the evidence supports a finding that Thomas Armitage was primarily involved in management functions while assigned to Defendants' construction projects. While Thomas Armitage sought to minimize the perception of the amount of time which he spend in such endeavors, his testimony lacks credibility in view of the depth and breadth of the tasks that he undertook as project manager.

### B.    Harry Armitage's Services

Plaintiff Harry Armitage began working for Defendants in June of 2002. (Harry Armitage Day 1). At first, he was paid as a piece rate worker, but he soon began performing work for which Defendants paid an hourly wage. (*Id.*). By about April of 2003, Harry Armitage was being paid only on an hourly wage basis, and he performed for Defendants doing plumbing work, and later as a foreman, until March 24, 2005. (*Id.*). During this time frame, Harry Armitage did not work for another employer, and his sole

source of income came from Defendants. (*Id.*). The Court finds Harry Armitage's testimony on these points both credible and supported by the documentary evidence of record.

Harry Armitage typically reported to Defendants' job site any time from about six o'clock to quarter-to-seven in the morning. (*Id.*). Although Defendants did not have a set time for his arrival or departure, the general contractors on each job site monitored the work of the subcontractors, and if it became apparent that work was not being completed in a timely manner, the general contractors would pressure the subcontractors to keep tighter control over their employees. (Harry Armitage Day 1; Hill  ).

Harry Armitage provided his own plumbing hand tools, which is customary in the field. (Harry Armitage Day 1). However, Defendants supplied workers on job sites with all of the materials needed to complete the contemplated work and, where necessary, specialized equipment such as mechanical hammers for chipping concrete. (*Id.*). Harry Armitage was not required to purchase equipment or materials or pay tolls while he performed as a plumber for Defendants. (*Id.*). In addition, Defendants permitted Harry Armitage to use a vehicle owned by Defendants and paid for his expenses. (Harry Armitage Day 1). Such expenses included his gasoline costs, tolls, and hotel charges. (Harry Armitage Day 1).

In 2002, Defendants required Harry Armitage to obtain an occupational license. (Harry Armitage Day 1). He let such license expire within a year. (*Id.*). Defendants also submitted into evidence an "Independent Contractors Agreement" signed by Harry Armitage. (Defendants' Ex. No. 8). Harry Armitage testified, however, that such agreement was presented to him as a take-it-or-leave-it proposition. (Harry Armitage Day 1). "If you don't want to sign it, you don't work." (*Id.*). In addition, Parrot required that Harry Armitage

purchase a workers compensation exemption certificate from Parrot's wife, who was an insurance agent at the time. (*Id.*). In contrast to what Harry Armitage believed he had purchased, Defendants submitted a certificate of liability insurance made for Armitage Construction. (Defendants' Ex. No. 9). Harry Armitage could not remember ever having applied for such insurance. (Harry Armitage Day 1). Furthermore, the insurance broker who purportedly produced this document had no record or recollection of Harry Armitage, Armitage Construction (his purported business name) or this insurance policy. (December 15, 2006 Testimony of Terry James). In short, it appears that such document was fabricated.

The Court finds that the testimony of Harry Armitage concerning his employment arrangements are more credible than the testimony of Defendants. Additionally, Defendants were more knowledgeable concerning employee versus independent contractor arrangements in the plumbing industry than was Harry Armitage. Other evidence of record also strongly suggests that the relationship in the instant case was contrived by Defendants and presented to Harry Armitage on a take-it-or-leave-it basis. For instance, to support their contentions, Defendants offered questionable documentation, a fabricated document or, in some cases, failed to offer any documentation at all.[3] The Court resolves the issue of

---

[3] Defendants provided only about fifteen time sheets for Plaintiffs in this case. (Parrot Day 1). Parrot testified that the remaining pay records were either lost during a move to new offices or destroyed during a hurricane. (*Id.*). Although Defendants attempt to undermine the credibility of such documentary evidence by suggesting Harry Armitage manufactured such documents from blank forms, the Court can discern no reason to challenge the records' authenticity, especially in view of the fact that such documentation generally is consonant with the evidence under the control of and produced by Defendants.

Harry Armitage's status as an employee of Defendants in favor of Plaintiff Harry Armitage and against Defendants based on the weight and credibility of the evidence.

While working for Defendants either on a piece-rate or hourly basis, Harry Armitage testified that he worked, on average, approximately forty-eight hours per week. (Harry Armitage Day 1 & Day 2).[4] When applicable, he was paid $15 for the installation of small tubs and fixtures and $20 for the installation of large garden tubs. (*Id.*). From April 23, 2003 until September 16, 2006, he was paid at the rate of $15 per hour, and he was paid thereafter at the rate of $16 per hour. (*Id.*). Although he was paid on an hourly basis, Defendants tendered both holiday and vacation pay to Harry Armitage. (*Id.*).

The record contains a number of time sheets which show Harry Armitage's piece-rate production for each week or show the number of hours that he worked. (Plaintiffs' Ex. No. 3). It also contains an accounting printout from Defendants of all of the checks made payable to Harry Armitage.[5] (Plaintiffs' Ex. No. 3; Plaintiffs' Ex. No. 17). Generally, a time sheet would be filled out on the job site which detailed the hours or production for the workers on each job site, and such time sheet would be sent via facsimile to Defendants' office. (Thomas Armitage Day 1; Harry Armitage Day 1; Parrot Day 1). Although he did not fill out every record, Thomas Armitage generally recorded each workers' time and production on a time sheet and forward it to Defendants. (Thomas Armitage Day 1). Parrot would then transfer the information to the accounting software on his computer, print out checks, and forward the checks to the job site. (Parrot Day 1). Although he would keep a

---

[4] The Court finds that Harry Armitage's testimony concerning his average workweek, i.e., forty-eight hours, both credible and uncontested.

[5] *See supra* note 3 and accompanying text.

record of Thomas Armitage's time for each week, Parrot did not keep time records of Harry Armitage. (*Id.*). After reviewing such documents, the Court calculates the potential overtime pay owed to Harry Armitage as shown in the five tables attached at the end of this Order.[6]

## II. Conclusions Of Law

These consolidated cases concern two broad questions. First, the Court must decide whether Thomas Armitage was employed by Defendants in an executive position that is exempt from the requirements of the Fair Labor Standards Act ("FLSA"). Secondly, the Court must consider whether Harry Armitage served Defendants as an employee or as an independent contractor.

### A.    Was Thomas Armitage Employed In An Executive Position?

In general, the FLSA mandates that employees receive one and one-half times their regular rate of pay for all hours worked in excess of forty per week.[7] *See* 29 U.S.C. § 207(a)(1). Federal law exempts from this mandate "any employee employed in a bona fide executive, administrative, or professional capacity" who receives payment on a salary basis. 29 U.S.C. § 213(a)(1); *see also Avery v. City of Talladega*, 24 F.3d 1337, 1340 (11th Cir. 1994). This exemption from the FLSA is construed narrowly by the courts, and the employer has the burden of showing that it is entitled to the exemption. *See Avery*, 24 F.3d at 1340; *see also Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001).

---

[6] The Court's calculations are described in detail in Part II.B.2.b of this Order.

[7] The purpose of the FLSA-required overtime pay is two-fold: "(1) to spread out employment by placing financial pressure on the employer to hire additional workers rather than employ the same number of workers for longer hours; and (2) to compensate employees who for a variety of reasons worked overtime." *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1256 n.4 (11th Cir. 2001).

For the time period relevant here, the Secretary of Labor promulgated two sets of regulations concerning the application of the executive exemption under the FLSA.[8] (Doc. No. 64, p. 6). Under the regulations in effect until August 23, 2003, Defendants must show that Thomas Armitage satisfies the requirements of the "short test" for the executive exemption.[9] *See Brock v. Norman Country Mkt., Inc.*, 835 F.2d 826 n.2 (11th Cir. 1988). The "short test" requires a showing "that (1) management [of a customary department or subdivision] was the employee's primary duty, and that (2) the employee regularly and customarily directed the work of two or more employees." *Strum v. TOC Retail, Inc.*, 864 F. Supp. 1346, 1350 (M.D. Ga. 1994). After August 23, 2003, the regulations provide a similar test to determine whether an individual is an executive employee. *See* 29 C.F.R. § 541.100 (2006). The post-2003 regulations require a showing that an employee (1) be paid on a salary basis at a rate of not less than $455 per week;[10] (2) be in a position whose primary duty is management of a customary department or subdivision; (3) customarily and regularly direct the work of two or more other employees; and (4) have the authority to hire or fire other employees or have the power to make such recommendations. *Id.*

---

[8] The regulations are given controlling weight by the Court unless they are arbitrary, capricious or manifestly contrary to the statute. *Avery*, 24 F.3d at 1340.

[9] The evidence shows that Thomas Armitage earned more than $250 per week during his employment, which is the amount of salary which separated the "short test" and "long test" under the previous regulatory provisions.

[10] The first requirement is not at issue in the instant case as the record demonstrates that Thomas Armitage received a salary at a rate above $455 per week at all relevant times.

Courts interpret whether an employee has management as his primary duty in light of the facts of each particular case. *See* 29 C.F.R. § 541.103 (2003). The pre-2003 regulations provide the following guidance:

> The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty. In the data processing field an employee who directs the day-to-day activities of a single group of programers and who performs the more complex or responsible jobs in programing will be considered to have management as his primary duty.

*Id.* In contrast, the post-2003 regulations define management as follows:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow

and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102 (2006); *see also id.* § 541.102(b) (2003). In total, the regulations identify a number of functions which indicate that an individual is performing a management role.

The evidence shows that Thomas Armitage performed on balance more management functions than not. He was the person in charge of specified construction projects for Defendants.[11] Thomas Armitage coordinated the hiring of day laborers for Defendants. He maintained and forwarded time records for the employees on his job sites and, at least a portion of the time, maintained and forwarded to Defendants the production of piece workers. He also fielded complaints from other employees about pay and, in at least one instance, fired an employee on Ralph Parrot's instruction. Further, Thomas Armitage verified the quality of the workmanship of Defendants' employees and piece workers.

General contractors required Thomas Armitage to attend at least weekly meetings to coordinate construction deadlines for Defendants, and it can be inferred from the record that he directed the work of Defendants' employees on the job site, coordinating such work with the needs of the general contractors.[12] In some instances, he was required to provide

---

[11] The Court also concludes from the testimony at trial that each construction project was customarily treated as a separate department or division within the meaning of the law as each construction project had a project manager who reported to Ralph Parrot, president of Dolphin Plumbing. *See* 29 C.F.R. § 541.103 (2006); *id.* § 541.104.

[12] Besides having admitted that he oversaw the workload of at least the Clermont project, it is incongruous to contend, for instance, that no one was providing direction to the day laborers and other workers performing the underground portion of a plumbing installation.

daily reports on behalf of Defendants to the general contractors. He also insured that materials needed to complete the plumbing installation were ordered through Elaine Thomas. Lastly, he made sure that each job site had the proper permits and "walked through" the job site with the building inspectors during inspections. In short, Thomas Armitage supervised the installation of the plumbing on a construction site, as his title "project manager" suggests. This long list of duties also belies Thomas Armitage's statements that he performed  such management functions only about ten percent of the time. The evidence shows that Thomas Armitage was more than a mere plumber; he "ran" the job site.

Both sets of regulations also require that an executive employee customarily and regularly supervise at least two full-time employees. *See* 29 C.F.R. § 541.104 (2006); *id.* § 541.105(a) (2003). This requirement was met in the instant case. Thomas Armitage admitted that there were at least two hourly employees in addition to piece workers and day laborers each day at each of his construction projects.[13]

Based on the foregoing, the Court concludes that Thomas Armitage served Defendants in an executive position, and therefore his employment is exempt from the overtime pay requirement of the FLSA.

### B.    Was Harry Armitage An Employee or Independent Contractor?

The Court first answers the question of whether Harry Armitage was an employee or an independent contractor. It then considers three issues relating to Harry Armitage's claim for unpaid overtime wages.

---

[13] Furthermore, Jerry Spratt testified that the work crews under his supervision were generally made up of three to ten workers.

### 1.      Employee or Independent Contractor

The FLSA's overtime pay provision applies only to employees. *Fruend v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 782 (11th Cir. 2006). The Act defines an "employee" as "any individual employed by an employer," *see* 29 U.S.C. § 203(e)(1), and the verb "employ" as "to suffer or permit to work." *See id.* § 203(g). Under the statute, an employer is "any person acting . . . in the interest of an employer in relation to an employee." *Id.* § 203(d).

"The Supreme Court has explained that courts must determine whether, as a matter of 'economic realit[y],' an individual is an employee or an independent contractor in business for himself." *Freund*, 185 Fed. Appx. at 782-83 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)). For such inquiry, courts consider the following factors:

> [a] the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> [b] the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> [c] the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> [d] whether the service rendered requires a special skill;
>
> [e] the degree of permanency and duration of the working relationship;
>
> [f] the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 783 (citing *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987)). No one of these factors is determinative, and courts must ultimately gauge the degree of dependance of the alleged employee on the business with which they are connected. *Usery*

*v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir. 1976).[14] The determination of employee status is a question of law as well as fact. *Freund*, 185 Fed. Appx. at 783.

### a.    The Nature And Degree Of Defendants' Control

On the one hand, it is apparent that Harry Armitage was expected to be on the job site by a certain time in the morning and remain there for at least a full day of work. Harry Armitage maintained that he arrived between six o'clock and quarter-to-seven each morning, but Defendants apparently did not require him to arrive at any particular time. Nevertheless, a general contractor did testify that if Defendants' workers were leaving early, he would have notified Defendants. (Hill). In addition to visiting Defendants' construction projects each week, Parrot placed a project manager in charge of each job site. Defendants' project managers supervised the installation of the plumbing and necessarily supervised Defendants' workers, such as Harry Armitage.

### b.    Harry Armitage's Opportunity For Profit Or Loss

In spite of their contention that Harry Armitage acted as an independent contractor, Defendants provided him with almost no opportunity to control his own profits or loss. Harry Armitage did not submit bids on the work that needed to be done. The work was offered on a take-it-or-leave-it basis, at a given rate, and with no opportunity to negotiate. When he was acting as a piece worker, such work was also apportioned by Defendants among several piece workers, and in some case piece workers had to wait, without getting paid,

---

[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

to commence work. The Court also notes that Harry Armitage frequently was paid an effective "hourly rate of pay" while acting as a piece worker well in excess of the later rate of pay that he received while acting as an hourly worker.[15] Thus, it can be inferred that Defendants purposely arranged to pay Harry Armitage an hourly rate to reduce their payroll costs. This factor, therefore, favors finding an employer-employee relationship.

### c.    Harry Armitage's Investment In Equipment Or Materials And His Employment Of Workers

Harry Armitage was not required to purchase any special tools or any materials for his work, although it appears that most plumbers maintain their own set of hand tools.[16] Instead, Defendants provided any special equipment and all materials that the job required. Further, Defendants provided Harry Armitage with a company-owned vehicle and paid his travel and lodging expenses.

There is no credible evidence that Harry Armitage employed his own crew of workers, and the Court concludes that he did not. Ralph Parrot testified that Harry Armitage was paid for the production of other workers. However, in the few instances where these payments were made, the credible evidence of record shows that such arrangement was promoted by Defendants.

---

[15] In fact, he earned substantially more money, on average, the weeks in which he was paid as a piece worker than those in which he was paid as a salaried worker.

[16] This factor also blends with Harry Armitage's opportunity to profit or loss. A true independent contractor would be expected to arbitrage the costs of equipment and materials, thereby attempting to profit from his knowledge of the needs of his trade. In this case, however, Defendants preempted Harry Armitage's opportunity for such a benefit by providing all the special equipment and material that he needed to complete the job.

### d. Whether The Service Rendered Requires A Special Skill

When he began working for Defendants, Harry Armitage did not hold a plumbing license, and he testified that he had formerly worked as an unskilled laborer for other plumbing companies. He began working for Defendants as a plumbing piece worker but also performed as an unskilled laborer. Ultimately, Harry Armitage must have become a successful plumber, because Defendants eventually placed him in charge as a job foreman.

In light of the fact that Harry Armitage began to work for Defendants as an unskilled laborer and novice plumber, this factor weighs in favor of Harry Armitage.

### e. The Degree Of Permanency And Duration Of The Relationship

Harry Armitage worked exclusively for Defendants over a period of more than three years. Moreover, Defendants paid him for holidays and vacations, a practice which strongly suggests an established employer-employee relationship. This testimony was uncontested, and it favors the conclusion that an employment relationship existed between Harry Armitage and Defendants.

### f. The Extent To Which The Services Rendered Are An Integral Part Of Defendants' Business

The final factor concerns the relationship between the services Harry Armitage rendered and Defendants' business. Harry Armitage installed plumbing fixtures and provided related services for Dolphin. Although he was initially paid on a piece-rate basis, he was also subsequently paid on an hourly basis to perform non-skilled labor. Later, he was paid on an hourly basis to work as a plumber and act as a working foreman for

Defendants. Given that Defendants admittedly serve as plumbing subcontractors, the Court determines that the services performed by Harry Armitage were identical to and an integral part of those provided by Defendants' business.

Based on the foregoing, the Court finds that the weight of the evidence supports the conclusion that Harry Armitage was paid as an employee of Defendants and not as an independent contractor. Defendants' project managers supervised and controlled Harry Armitage's work. Further, because of the manner in which Defendants' structured their relationship, Harry Armitage was not given the opportunity to profit from his position, and he was similarly not required to invest in any special equipment or materials to complete the contemplated plumbing work. He also did not possess any special skill when he began working with Defendants, even though Defendants paid Harry Armitage to perform plumbing piece work from the beginning. Lastly, Harry Armitage had an exclusive relationship over a three year period with Defendants.

### 2.    Harry Armitage's Claim For Unpaid Overtime Wages

Because the Court has determined that Harry Armitage was an employee of Defendants, it must now consider several issues relating to his damages. First, the Court considers whether the general two-year or exceptional three-year statute of limitations applies to his claim. Then, the Court details the amount of unpaid overtime wages owed to Harry Armitage for work performed during the applicable limitations period. Lastly, the Court determines whether Harry Armitage is entitled to liquidated damages.

### a.    The Applicable Statute of Limitations

Under the FLSA, "[E]very [cause of] action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of

action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).  Thus, ordinary violations of the FLSA are subject to a two-year statute of limitations. *Id.* To receive the benefit of the three-year statute of limitations, a plaintiff must show that the employer's conduct was willful. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). That is, a plaintiff must demonstrate that the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA. *Id.*

The Court concludes that the testimony of Harry Armitage is more credible that the testimony of Defendants' witnesses on this issue. Ralph Parrot had extensive experience as a manager in the plumbing industry. He was knowledgeable about the provisions of the FLSA and testified that he researched the requirements of the wage laws on the internet. Further, Defendants lost the time records of Harry Armitage, but Mr. Armitage had retained such records to support his contentions. Lastly, Defendants produced falsified insurance documentation to support their contention that Harry Armitage was acting as an independent contractor, and Harry Armitage testified that he did not recall purchasing such insurance.

In view of the above, the Court concludes that Defendants deliberately chose to circumvent the Act's overtime requirements by treating Harry Armitage as if he were an independent contractor when he was an employee. *See McLaughlin v. Stineco, Inc.*, 697 F. Supp. 436, 447 n.16 (M.D. Fla. 1988) (reasoning that defendants' attempt to label certain employees as independent contractors supports the inference that such defendants were seeking to avoid the requirements of the FLSA). That is, Defendants acted willfully and in

reckless disregard of the requirements of the FLSA. Thus, Harry Armitage should receive the benefit of the three-year statute of limitations under Section 255(a).

### b.    The Unpaid Overtime Wages Of Harry Armitage

It is well-established that an employee bringing a claim for unpaid overtime wages must initially demonstrate that he performed work for which he was not properly compensated. *See, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).[17] In instances where accurate records or precise evidence of an employee's hours worked do not exist, an employee carries his burden (1) if he proves that he had in fact performed work for which he was improperly compensated and (2) if he produces sufficient evidence to show the amount and extent of such work. *Rossi v. Associated Limousine Servs., Inc.*, 438 F. Supp. 2d 1354, 1365 (S.D. Fla. 2006) (quoting *Tho Dinh Tran v. Alphonse Hotel Corp.*, 28 F.3d 23, 31 (2d Cir. 2002)). Once the employee makes out a *prima facie* case by producing such evidence, the burden shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946). If the employer fails to meet such burden, a court may award approximate damages base upon the evidence adduced by the employee. *Id.*

---

[17] Congress later superseded the main holding of the Supreme Court by enacting the Portal-to-Portal Act. *See Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972). Nevertheless, the burden shifting formulation set forth in *Anderson* is still used by courts today to sort out the evidentiary issues related to determinations of unpaid wages. *See Rossi v. Associated Limousine Servs., Inc.*, 438 F. Supp. 2d 1354, 1365 (S.D. Fla. 2006); *McLaughlin v. Stineco, Inc.*, 697 F. Supp. 436, 449-50 (M.D. Fla. 1988).

Harry Armitage met his initial burden in the instant case, and Defendants failed to negate the evidence of Harry Armitage's average workweek. The record contains computer printouts of the weekly checks paid to Harry Armitage, time sheets that were produced by Harry Armitage during the course of this litigation, and undisputed testimony concerning his hourly rate of pay. According to the testimony of Harry Armitage, which stands unopposed by Defendants, he worked an average of forty-eight (48) hours per week during the time period in which he was being paid an hourly wage. In contrast, Defendants did not submit records of the number of hours that Harry Armitage worked, and indeed, Parrot admitted that he did not keep such records.

After reviewing the time sheets and the accounting printouts of Defendants, the Court makes the following findings of overtime pay, as enumerated in the five tables attached at the end of this Order. Harry Armitage is owed a total of $2,928.88 in unpaid overtime wages for piece work performed for Defendants. The court calculated such unpaid overtime wages using the formula provided in Title 29 C.F.R. § 778,111(a) in view of the check amount indicated in Plaintiff's Exhibit No. 17 and a forty-eight hour work week.[18] (*See* Table 1, *infra*). For the remaining time periods, the Court first determined, using the amount indicated in Plaintiff's Exhibit No. 17 and the applicable hourly rate, the number of hours worked by Harry Armitage that week, if there was no direct evidence of the hours worked.[19] (*See* Table 2 & Table 3, *infra*). The Court then calculated the number of hours over forty

---

[18] In case clarification is needed, the Court rounded the one half regular rate of pay calculated from the amount paid to the nearest penny. (*See* Table 1, *infra*, col. 3).

[19] The table entry indicates whether the record demonstrates that a particular number of hours were worked that week.

per week worked by Harry Armitage and multiplied the result by one-half the regular rate of pay. (*See id.*). For the time period from April 24, 2003 to September 16, 2004, Harry Armitage is owed $4,922.75 in unpaid overtime wages, (*see* Table 2, *infra*), and for the time period from September 17, 2004 to March 24, 2005, Harry Armitage is owed $664.00 in unpaid overtime wages. (*See* Table 3, *infra*). Where the hourly rate calculated was not an integer or a number rounding to one-half, the Court calculated unpaid overtime pay based on the average number of hours worked per week, i.e., forty-eight hours, for a total of $684.00. (*See* Table 4, *infra*). Thus, the total amount of unpaid overtime wages for Harry Armitage is $9,199.63. (*See* Table 5, *infra*).

### c.  Liquidated Damages Under Title 29 U.S.C. § 216(b)

Under Section 216(b), an employee who was not paid overtime wages shall receive an amount equal to the unpaid wages in liquidated damages. *See, e.g.*, *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1573 (11th Cir. 1988). Such liquidated damages are mandatory unless the employer shows its actions were in good faith and shows it had reasonable grounds for believing that those actions did not violate the FLSA. *Id.*; *see also* 29 U.S.C. § 260. Because the Court concludes above that Defendants willfully violated the provisions of the FLSA, it must also conclude that Defendants did not act in good faith. *See, e.g.*, *Glenn*, 841 F.2d at 1573 n.14 (noting that a finding of willfulness in the context of the FLSA's statute of limitations precludes, as a matter of law, a finding of good faith in the context of liquidated damages). Thus, Harry Armitage is entitled an amount of liquidated damages equal to the amount of unpaid overtime wages. *See* 29 U.S.C. § 216(b).

### III.  Conclusion

In view of the above findings of fact and conclusions of law, the Court rules in favor of Defendants Dolphin Plumbing & Mechanical, LLC. and Ralph Parrot and against Plaintiff Thomas Armitage on his claim for overtime wages and liquidated damages. The Court rules in favor of Plaintiff Harry Armitage and against Defendants on his claim for overtime compensation in the amount of $9,199.63 plus liquidated damages in the amount of $9,199.63 for a total amount of $18,399.26. The Clerk of Court shall enter judgment in favor of Plaintiff Harry Armitage and against Defendants, jointly and severally, for this amount. All claims for costs or attorneys' fees shall be asserted by counsel in a separate motion no later than fourteen (14) days following the entry of judgment.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on February 13th , 2007.

_____
PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record
Clerk of Court

-22-

**TABLE 1: Unpaid Overtime Wages for Piece Work from June 26, 2006
to April 17, 2003 as Calculated Under Title 29 C.F.R. § 778.111 (2003)**

| Payment Date | Amount Paid | One Half Regular Rate of Pay | Unpaid Wages |
|---|---|---|---|
| July 3, 2002 | $680.00 | $7.08 | $56.64 |
| July 18, 2002 | $1,152.50 | $12.01 | $96.08 |
| August 8, 2002 | $1,470.00 | $15.31 | $122.48 |
| August 22, 2002 | $1,540.00 | $16.04 | $128.32 |
| September 5, 2002 | $1,160.00 | $12.08 | $96.64 |
| September 12, 2002 | $780.00 | $8.13 | $65.04 |
| September 19, 2002 | $600.00 | $6.25 | $50.00 |
| September 26, 2002 | $1,140.00 | $11.88 | $95.04 |
| October 3, 2002 | $1,320.00 | $13.75 | $110.00 |
| October 10, 2002 | $680.00 | $7.08 | $56.64 |
| October 17, 2002 | $795.00 | $8.28 | $66.24 |
| October 24, 2002 | $840.00 | $8.75 | $70.00 |
| October 31, 2002 | $600.00 | $6.25 | $50.00 |
| November 7, 2002 | $255.00 | $2.66 | $21.28 |
| November 14, 2002 | $660.00 | $6.88 | $55.04 |
| November 21, 2002 | $705.00 | $7.34 | $58.72 |
| November 26, 2002 | $630.00 | $6.56 | $52.48 |
| December 6, 2002 | $1,200.00 | $12.50 | $100.00 |
| December 12, 2002 | $1,132.50 | $11.80 | $94.40 |
| December 18, 2002 | $1,950.00 | $20.31 | $162.48 |
| December 26, 2002 | $735.00 | $7.66 | $61.28 |
| January 2, 2003 | $1,537.50 | $16.02 | $128.16 |
| January 8, 2003 | $720.00 | $7.50 | $60.00 |
| January 16, 2003 | $1,050.00 | $10.94 | $87.52 |
| January 21, 2003 | $1,200.00 | $12.50 | $100.00 |
| January 30, 2003 | $487.50 | $5.08 | $40.64 |
| February 6, 2003 | $622.50 | $6.48 | $51.84 |
| February 13, 2003 | $615.00 | $6.41 | $51.28 |
| February 20, 2003 | $1,260.00 | $13.13 | $105.04 |
| February 27, 2003 | $727.50 | $7.58 | $60.64 |
| March 6, 2003 | $1,200.00 | $12.50 | $100.00 |

| Payment Date | Amount Paid | One Half Regular Rate of Pay | Unpaid Wages |
|---|---|---|---|
| March 13, 2003 | $1,305.00 | $13.59 | $108.72 |
| March 20, 2003 | $780.00 | $8.13 | $65.04 |
| March 27, 2003 | $825.00 | $8.59 | $68.72 |
| April 2, 2003 | $712.50 | $7.42 | $59.36 |
| April 10, 2003 | $675.00 | $7.03 | $56.24 |
| April 17, 2003 | $1,402.50 | $14.61 | $116.88 |
| | **Unpaid Overtime Wages Subtotal:** | | **$2,928.88** |

**TABLE 2: Unpaid Overtime Wages for Hourly Rate Wages from
April 24, 2003 to September 16, 2004 (Pay Records)**

| Payment Date | Amount Paid | Hours Worked Per Week | Unpaid Wages |
|---|---|---|---|
| April 24, 2003 | $635.50 | 42.37 | $17.75 |
| May 1, 2003 | $840.00 | 56.00 | $120.00 |
| May 8, 2003 | $795.00 | 53.00 | $97.50 |
| May 15, 2003 | $742.50 | 49.50 | $71.25 |
| May 22, 2003 | $742.50 | 49.50 | $71.25 |
| May 29, 2003 | $645.00 | 43.00 | $22.50 |
| June 5, 2003 | $675.00 | 45.00 | $37.50 |
| June 19, 2003 | $742.50 | 49.50 | $71.25 |
| June 26, 2003 | $802.50 | 53.50 | $101.25 |
| July 2, 2003 | $862.50 | 57.50 | $131.25 |
| July 10, 2003 | $667.50 | 44.50 | $33.75 |
| July 17, 2003 | $720.00 | 48.00 | $60.00 |
| July 24, 2003 | $840.00 | 56.00 | $120.00 |
| July 30, 2003 | $825.00 | 55.00 | $112.50 |
| August 7, 2003 | $817.50 | 54.50 | $108.75 |
| August 14, 2003 | $787.50 | 52.50 | $93.75 |
| August 21, 2003 | $877.50 | 58.50 | $138.75 |
| August 28, 2003 | $877.50 | 58.50 | $138.75 |
| September 1, 2003 | $825.00 | 55.00 | $112.50 |
| September 11, 2003 | $780.00 | 52.00 | $90.00 |
| September 18, 2003 | $862.50 | 57.50 | $131.25 |
| October 2, 2003 | $870.00 | 58.00 | $135.00 |
| October 9, 2003 | $825.00 | 55.00 | $112.50 |
| October 16, 2003 | $892.50 | 59.50 | $146.25 |
| October 23, 2003 | $795.00 | 53.00 | $97.50 |
| October 30, 2003 | $802.50 | 53.50 | $101.25 |
| November 6, 2003 | $847.50 | 56.50 | $123.75 |
| November 13, 2003 | $847.50 | 56.50 | $123.75 |
| November 25, 2003 | $952.50 | 63.50 | $176.25 |
| December 4, 2003 | $727.50 | 48.50 | $63.75 |
| December 18, 2003 | $817.50 | 54.50 | $108.75 |

| Payment Date | Amount Paid | Hours Worked Per Week | Unpaid Wages |
|---|---|---|---|
| December 23, 2003 | $810.00 | 54.00 | $105.00 |
| February 5, 2004 | $705.00 | 47.00 | $52.50 |
| February 12, 2004 | $720.00 | 48.00 | $60.00 |
| February 26, 2004 | $892.50 | 59.50 | $146.25 |
| March 4, 2004 | $870.00 | 58.00 | $135.00 |
| March 11, 2004 | $900.00 | 60.00 | $150.00 |
| March 18, 2004 | $892.50 | 59.50 | $146.25 |
| March 25, 2004 | $787.50 | 52.50 | $93.75 |
| April 1, 2004 | $675.00 | 45.00 | $37.50 |
| April 8, 2004 | $667.50 | 44.50 | $33.75 |
| April 15, 2004 | $795.00 | 53.00 | $97.50 |
| April 28, 2004 | $765.00 | 51.00 | $82.50 |
| May 6, 2004 | $780.00 | 52.00 | $90.00 |
| May 13, 2006 | * | 42.00 | $15.00 |
| May 20, 2004 | $780.00 | 52.00 | $90.00 |
| May 26, 2004 | $750.00 | 50.00 | $75.00 |
| June 3, 2004 | $720.00 | 48.00 | $60.00 |
| June 10, 2004 | ** | 41.00 | $7.50 |
| June 24, 2004 | $645.00 | 43.00 | $22.50 |
| July 8, 2004 | $705.00 | 47.00 | $52.50 |
| July 15, 2004 | $720.00 | 48.00 | $60.00 |
| July 22, 2004 | $810.00 | 54.00 | $105.00 |
| July 29, 2004 | $690.00 | 46.00 | $45.00 |
| August 12, 2004 | $690.00 | 46.00 | $45.00 |
| September 2, 2004 | $690.00 | 46.00 | $45.00 |
| **Unpaid Overtime Wages Subtotal:** | | | $4,922.75 |

   * Harry Armitage testified that the March 13, 2006 paycheck represented a total of forty-two hours work and included payment for a number of other piece workers because Ralph Parrot wanted Harry to handle their payments. (Harry Armitage Day 1).

   ** The evidence of record demonstrated that the payment made on June 10, 2004 was for a total of forty-one hours worked and included an additional $91.25 as reimbursement for "tolls and fuel." (Harry Armitage Day 1).

-26-

**TABLE 3: Unpaid Overtime Wages for Hourly Rate Wages
from September 17, 2004 to March 24, 2005 (Pay Records)**

| Payment Date | Amount Paid | Hours Worked Per Week | Unpaid Wages |
|---|---|---|---|
| October 7, 2004 | $888.00 | 55.50 | $124.00 |
| October 14, 2004 | $864.00 | 54.00 | $112.00 |
| October 21, 2004 | $704.00 | 44.00 | $32.00 |
| November 4, 2004 | * | 43.00 | $24.00 |
| November 10, 2004 | $760.00 | 47.50 | $60.00 |
| November 23, 2004 | $656.00 | 41.00 | $8.00 |
| December 9, 2004 | $736.00 | 46.00 | $48.00 |
| January 27, 2005 | $776.00 | 48.50 | $68.00 |
| February 2, 2005 | $792.00 | 49.50 | $76.00 |
| February 17, 2005 | $792.00 | 49.50 | $76.00 |
| February 24, 2005 | $680.00 | 42.50 | $20.00 |
| March 3, 2005 | $672.00 | 42.00 | $16.00 |
| | **Unpaid Overtime Wages Subtotal:** | | $664.00 |

   * The evidence shows that the payment made on November 4, 2004 was for a total of forty-three hours worked and included an additional reimbursement of $70.80. (Harry Armitage Day 1).

**TABLE 4: Unpaid Overtime Wages for Hourly Rate Wages
From Payments Not Supported By Pay Records**

| Payment Date | Amount Paid | Average Overtime Hours Worked Per Week | Unpaid Wages |
|---|---|---|---|
| June 12, 2003 | $820.00 | 8 | $60.00 |
| September 25, 2003 | $767.50 | 8 | $60.00 |
| November 20, 2003 | $978.45 | 8 | $60.00 |
| January 15, 2004 | $882.50 | 8 | $60.00 |
| January 22, 2004 | $902.50 | 8 | $60.00 |
| January 29, 2004 | $976.00 | 8 | $60.00 |
| April 22, 2004 | $812.50 | 8 | $60.00 |
| June 16, 2004 | $786.00 | 8 | $60.00 |
| August 26, 2004 | $754.50 | 8 | $60.00 |
| September 30, 2004 | $893.90 | 8 | $64.00 |
| October 28, 2004 | $778.00 | 8 | $64.00 |
| March 17, 2005 * | $686.74 | 2 | $16.00 |
| **Unpaid Wages Subtotal:** | | | $684.00 |

   * For the payment made on March 17, 2005, Harry Armitage could have received payment for at most two whole hours of overtime (as payment in such an event would have totaled $672.00).

**TABLE 5: Total Unpaid Overtime Wages for Plaintiff Harry Armitage**

| Table No. | Unpaid Wages |
|---|---|
| 1 | $2,928.88 |
| 2 | $4,922.75 |
| 3 | $664.00 |
| 4 | $684.00 |
| **Total Unpaid Overtime Wages:** | $9,199.63 |